UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. 07-21830

IN THE MATTER OF THE EXTRADITION
OF MANUEL ANTONIO NORIEGA
_____/

GOVERNMENT'S REPLY TO NORIEGA'S
OPPOSITION TO THE EXTRADITION COMPLAINT

The United States, by and through the undersigned Assistant United States Attorney, hereby submits this reply to the opposition to the extradition complaint filed by General Manuel Antonio Noriega. The government states as follows:

Noriega does not contest, or even address, the only requirements that must be satisfied for the Court to find that he is extraditable – that the extradition request establish probable cause for the crimes currently pending against Noriega in France and that it be made pursuant to a valid extradition treaty between the United States and France. Noriega therefore concedes that these requirements have been satisfied here, warranting the issuance of a certificate of extraditability. Rather than address these issues, the sole basis of Noriega's opposition is his novel claim that the Geneva Conventions prohibit his extradition in light of his status as a prisoner of war (POW). *See United States v. Noriega*, 808 F. Supp. 791, 803 (S.D. Fla. 1992).

1

This claim is without merit and, in any event, may only be considered by the Secretary of State following the issuance of a certificate of extraditability. The Geneva Conventions do not prohibit the extradition of a POW to face criminal charges when, as here, the prerequisites of Article 12 of the 1949 Geneva Convention III Relative to the Treatment of Prisoners of War (Geneva III) have been satisfied. Accordingly, this Court should certify the requested extradition.

## I. THERE IS PROBABLE CAUSE SUPPORTING A VALID EXTRADITION REQUEST.

On July 17, 2007, the United States filed an initial complaint for the extradition of Manuel Antonio Noriega, at the request of the Government of the Republic of France, pursuant to the Extradition Treaty of April 23, 1996, between the United States of America and the Republic of France. Noriega has been convicted *in absentia* in France on charges of engaging in financial transactions with the proceeds of illegal drug trafficking, an offense that corresponds to money laundering under United States law (*see* 18 U.S.C. §§ 1956 and 1957).

Noriega does not contest, nor could he contest, that the extradition complaint establishes probable cause for the crimes with which he is charged. As outlined in the complaint and further detailed in the request for extradition, France has provided detailed evidence, drawing on the proof presented in the prior United States prosecution that led to Noriega's conviction in 1992 on drug trafficking charges in the Southern District of Florida and evidence developed in France's own investigation and prosecution, of Noriega's money laundering activities in France. The French request shows that testimony at Noriega's trial in this country proved beyond a reasonable doubt that he received millions of dollars in illegal drug trafficking proceeds and deposited them in Panamanian bank accounts. Further French investigation has traced those

funds as they were transferred to banks in France and other European countries. The French have evidence showing how the funds were transferred from account to account, often in the names of others, in order to conceal the source and true ownership of the money. As Noriega does not contest the existence of probable cause, this Court should find that probable cause.

    **II.    THERE IS A VALID EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMERICA AND FRANCE**.

Noriega also does not contest that there is a valid extradition treaty between the United States and France, that the crimes for which his extradition is sought are covered by Article 2 of that treaty, and that the request complies with the other requirements of the extradition treaty. Because Noriega does not contest these issues, the Court should find that the French request was properly made pursuant to a valid extradition treaty between the United States and France. As Noriega does not contest probable cause or any of the other elements required for an extradition to be certified, this Court should proceed with the requested certification.

    **III.    THE REQUESTED EXTRADITION IS IN FULL ACCORD WITH THE GENEVA CONVENTIONS**.

Noriega's sole challenge to the requested extradition is based on his argument that the Geneva Conventions prohibit his extradition to France. That argument is unavailing. The power to transfer (by deportation, extradition, or other means) any foreign national to another country is inherent in the sovereignty of any nation, except to the extent that it is constrained or regulated by domestic or international law. When it became a party to the Geneva Conventions, the United States agreed to abide by certain express limitations on its pre-existing powers as a sovereign nation. Thus, the question is not, whether Geneva III specifically grants the United States the power to extradite a prisoner of war to another country. The question

rather is to what extent Geneva III expressly limits the United States' pre-existing power to extradite a prisoner of war to face criminal charges in another nation.

The only provision of the Geneva Conventions relied on by Noriega in support of his claim that the requested extradition is barred by the Conventions is Article 118 of Geneva III. Noriega argues that Article 118 "requires that [the] United States repatriate [him] to the Republic of Panama upon his release from the custody of the Bureau of Prisons on September 9, 2007." Opposition at 12. This is simply not the case. Article 118 provides that a prisoner of war "shall be released and repatriated without delay *after the cessation of active hostilities*" (emphasis added). Obviously, Noriega was not repatriated to Panama upon the cessation of hostilities; hostilities ceased nearly two decades ago. That is because Article 118 cannot be read in isolation – as Noriega attempts to do – but rather must be read in accordance with other provisions of Geneva III. In particular, Article 119 of Geneva III provides, in part:

> Prisoners of war against whom criminal proceedings for an indictable offense are pending may be detained until the end of such proceedings, and, if necessary, until the completion of the punishment. The same shall apply to prisoners of war already convicted of an indictable offense.

This is precisely the provision that allowed the United States to retain custody over Noriega, put him on trial, and confine him during the duration of his federal criminal sentence long after the hostilities in Panama that resulted in his capture had ceased. Indeed, "[t]he Convention clearly sets POWs convicted of crimes apart from other prisoners of war, making special provision for them in Articles 82-108 on 'penal and disciplinary sanctions.'" *Noriega*, 808 F.Supp. at 799-800.

By the same token, Article 119 of Geneva III allows for the continued detention of the defendant based upon pending "criminal proceedings" for another "indictable offense" in

France, and his detention in France may continue "until the completion of the punishment" on the separate and distinct French charges. "[T]he ultimate goal of Geneva III is to ensure humane treatment of POWs," *Noriega*, 808 F.Supp. at 799; it is not to prevent them from facing justice for crimes they have committed. Nothing in the Geneva Conventions suggests that a prisoner of war cannot be extradited from one High Contracting Party to face criminal charges in another High Contracting Party. To the contrary, the official commentary to Article 119 confirms that Geneva III contemplated detention of prisoners of war for criminal proceedings without specifying that such detention is limited to detention by the nation that originally captured the prisoner of war:

> This amendment was considered necessary since it was not the intention of the drafters of the Convention that a prisoner should be detained because proceedings were being taken against him or because he was summoned to appear before court for neglect of some obligation in civil law; they were thinking only of prisoners of war subject to criminal proceedings. It should be noted that the present provision does not oblige the Detaining Power to detain prisoners under such prosecution or conviction; it is a step which the Detaining Power may take if it wishes.

3 International Committee of the Red Cross, *Commentary on the Geneva Conventions* (J. Pictet, ed., 1960) ("*Commentary*"). Simply put, the Geneva Conventions do not prohibit the honoring of an extradition treaty between two Parties to the Conventions. Extradition, to another Party willing and able to provide a prisoner of war with treatment that is consistent with the Conventions, furthers both the central purpose of Geneva III and the ends of justice.

The only restrictions placed on the extradition of a POW to face criminal charges are specified in Article 12 of Geneva III, which expressly provides for the transfer of POWs between parties to the Geneva Conventions "after the Detaining Power has satisfied itself of the willingness and ability of such transferee Power to apply the Convention." As Noriega correctly

notes, this provision is not a grant of authority to transfer POWs – that authority pre-existed the creation of the Geneva Conventions. It is, instead, a limitation upon that pre-existing authority.

The Commentary to Article 12 makes clear that this provision establishes two, and only two, prerequisites for the transfer of POWs. The first is that "prisoners of war may only be transferred from one Power which is a party to the Convention to another Power which is a party to the Convention." That prerequisite is satisfied here, as both France and the United States are Parties to the Conventions. The second prerequisite is that "such transfer may only take place after the transferring Power has satisfied itself of the willingness and ability of the receiving Power to apply the Convention." Once again, that prerequisite has been satisfied. In full compliance with Article 12, the United States has engaged in diplomatic communications with the Government of France concerning the treatment that Noriega has received in the United States by virtue of the Court's ruling giving him prisoner of war status and the comparable treatment he would receive in France. *See Noriega*, 808 F. Supp. at 803. As a result of those communications, the United States, in accordance with Article 12 of Geneva III, has satisfied itself that France will extend to Noriega the benefits that he has enjoyed in the United States under Geneva III.

Contrary to Noriega's claims, Article 12 is not limited to transfers of a POW between allies to the conflict that originally led to the capture of the POW. As the Commentary to Article 12 makes clear, the need to make provisions in the Geneva Conventions for the protection of POWs who are transferred between nations was highlighted by the fact that transfers of POWs were likely to occur between allies with the creation of "military organizations for collective defence such as the North Atlantic Treaty Organization and the Warsaw Pact," but Article 12 is in no way limited to such circumstances. Moreover, under

Noriega's proposed interpretation of Article 12, the United States could extradite Noriega to France if France had taken up arms against Panama, but because France was not a party to the conflict between the United States and Panama, he can escape French justice.[1] The suggestion that the Conventions penalize France for not going to war is at odds with the basic principles of the Conventions. Indeed, the transfer of POWs under Article 12 between Parties to the Conventions that were not allies in the underlying armed conflict is not without precedent. During the war between the Soviet Union and Afghanistan, Afghanistan transferred two Soviet POWs to Switzerland pursuant to Article 12. Switzerland was obviously not a party to the Soviet/Afghan War.

Thus, when properly read in conjunction, Articles 12, 118, and 119 of Geneva III provide as follows: a prisoner of war must be repatriated following the cessation of hostilities unless he faces, or has been convicted of, indictable criminal charges in either the Detaining Power or another Party to the Conventions that is willing and able to afford the POW treatment that is consistent with the Conventions. Given that all of those conditions have been satisfied, the Geneva Conventions do not bar Noriega's extradition to France.

That Geneva III does not bar the transfer between nations of individuals subject to its protections is further highlighted by Article 129, which authorizes a signatory to "hand over . . . for trial to another High Contracting Party" a person alleged to have committed a war crime, "provided such High Contracting Party has made out a prima facie case." *See* 3 *Commentary*, Art. 129 (explaining this article as an extradition provision); *accord,* Howard S. Levie, *Prisoners of War in International Armed Conflict*, 59 Naval War College International Law Studies

---

[1] If Noriega were returned to Panama, he could not then be extradited to France in light of Panama's constitutional prohibition on the extradition of its nationals.

(Newport, RI, 1977), p. 376. Clearly Article 129 does not apply to the current extradition, as France does not seek Noriega's extradition as a war criminal but rather as a money launderer. However, Article 129 does serve to further demonstrate that the goal of the Conventions is to ensure the humane treatment of POWs, not to prevent them from standing trial for the crimes they have committed.

Noriega attempts to stand Article 129 on its head by arguing that, because Article 129 makes specific provision for the extradition of war criminals, the drafters of the Conventions knew how to an extradition provision when they wanted to, and because they made no explicit provision for an ordinary criminal extradition, such an extradition is prohibited. However, Article 129 is not meant to identify all possible instances in which an individual committing war crimes, including a POW, can be extradited; rather, it creates a specific set of obligations (e.g. seeking out, arresting, and trying war criminals if they are not extradited) with respect to a specific type of crime. Like other multilateral treaties that address specific types of offenses, Article 129 does not apply to and is not intended to create limitations with respect to crimes that are not the subject of the treaty. The imposition of these obligations to either try or extradite a war criminal cannot strip the United States of its pre-existing authority as a sovereign nation to extradite a POW to face other criminal charges. The Geneva Conventions did not need to make provision for ordinary criminal extraditions because other bilateral extradition treaties already did so.

In short, Noriega's reliance on Article 118 of Geneva III for an absolute right of repatriation is misplaced. In light of the provisions of Geneva III that allow for both the detention of prisoners of war during the pendency of criminal proceedings and the transfer of prisoners of war between High Contracting Parties, extradition of this defendant - designated a

prisoner of war – to face criminal charges is in complete accord with Geneva III.  As with any treaty, the view of the Executive Branch on the proper interpretation of Geneva III is to be accorded great weight by the courts.  *See El Al Israel Airlines, Ltd. v. Tseng,*, 525 U.S. 155, 168 (1999); *Sumitomo Shoji America, Inc. Vv. Avagliano*, 457 U.S. 176, 184-185 (1982).

### IV.   THE GENEVA CONVENTIONS ARE NOT PROPERLY RAISED IN THESE PROCEEDINGS.

Not only is Noriega's claim that the Geneva Conventions bar the extradition request incorrect as a matter of law, but he also has asserted that claim in the wrong forum.  The role of this Court is limited in the extradition process to making only the determinations called for by 18 U.S.C. §§ 3184 – that there is sufficient evidence to sustain the charge for which the fugitive is sought under the provisions of a valid treaty.  Thus, Noriega's claim under the Geneva Conventions could be properly raised only before the Secretary of State, after the Court issues a certificate of extraditability, as part of her determination whether to issue a surrender warrant.  *See Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 828 (11th Cir. 1993) (discussing the history of extradition as an executive function and the limited role of the  court).  The enactment by Congress of the Military Commissions Act of 2006,  Pub.L. No. 109-366, § 5(a), Oct. 17, 2006, 120 Stat. 2631,[2] confirms the central role of the Executive Branch here.  Section 5(a) of the Military Commissions Act of 2006 has codified the principle that the Geneva Conventions are

---

[2] That provision states: "No person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party as a source of rights in any court of the United States or its States or territories."

not judicially enforceable by private parties.[3] However, the Court need not rely on the Military Commissions Act, given that the requested extradition fully complies with the Geneva Conventions.[4]

## CONCLUSION

The paramount issue of every extradition proceeding is whether there exists probable cause to believe that the fugitive has committed the crimes charged in the requesting country. Noriega does not contest the existence of probable cause. His opposition to the requested extradition instead rests entirely upon his novel claim that the Geneva Conventions give him the right to be free from an extradition proceeding. That right simply does not exist in the Geneva Conventions and, in any event, is only ripe for consideration by the Secretary of State in the context of deciding whether to issue a surrender warrant. Nothing in the Geneva Conventions bars Noriega's extradition to France to face pending criminal charges there in light of the facts that France is a party to the Conventions and the United States is satisfied, following diplomatic consultations, that France will afford Noriega the same protections he has enjoyed while serving

---

[3] The intent of this unambiguous statute is confirmed by the legislative history. House Report 109-664(II) states that Section 5(a) "would prohibit any court from treating the Geneva Conventions as a source of rights, directly or indirectly, making clear that the Geneva Conventions are not judicially enforceable in any court of the United States." H.R. 109-664(II) refers to Section 5(a) as Section 6(b) because the numbering, but not the substance, or that subsection of the Act changed during the legislative process.

[4] While the constitutionality of certain portions of the Military Commission Act are currently before the Supreme Court for review, *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *cert. granted*, 127 S.Ct. 3078 (June 29, 2007), the constitutionality of Section 5(a) has not been challenged. Indeed, Section 5(a) does not touch upon the Suspension Clause in the United States Constitution because it does not purport to strip anyone of the right to file a habeas petition.

his criminal sentence in the United States. Accordingly, this Court should issue a certificate of extraditability.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

 s/ Michael P. Sullivan
Michael P. Sullivan
Assistant United States Attorney
Florida Bar No. 134814
Florida 33132-2111
Tel: (305) 961-9274
Fax: (305) 536-7213
Pat.Sullivan@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on August 23, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

 s/ Michael P. Sullivan
Michael P. Sullivan
Assistant United States Attorney